**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
————————————————————————————

**BETTY MITCHELL,**

                          **Plaintiff,**              **14 Cv. 04154**

        **- against -**                    <u>**MEMORANDUM OPINION AND**</u>
                                            <u>**ORDER**</u>
**CAROLYN W. COLVIN, COMMISSIONER OF**
**SOCIAL SECURITY,**

                          **Defendant.**
————————————————————————————

**JOHN G. KOELTL, District Judge:**

     The plaintiff, Betty Mitchell, brought this action to seek
review of a final decision of the defendant, the Commissioner of
Social Security (the "Commissioner"), that the plaintiff was not
entitled to Disability Insurance Benefits ("DIB") under Title II
of the Social Security Act (the "Act"), and Supplemental
Security Income ("SSI") under Title XVI of the Act. After the
plaintiff's claims for DIB and SSI benefits were initially
denied, the plaintiff filed a written request for a hearing. The
Administrative Law Judge ("ALJ") held a hearing on June 14,
2012, and denied the plaintiff's claims on December 31, 2012.
After the Appeals Council declined review on April 28, 2014, the
decision of the ALJ became the final decision of the
Commissioner.

     The parties filed cross-motions for judgment on the
pleadings pursuant to the Federal Rule of Civil Procedure 12(c).

**I.**

The administrative record contains the following facts.

The plaintiff, born August 8, 1959, has a high school education. (AR 98, 124.) From 1996 until 2000, the plaintiff worked sporadically, including as a sales associate, clerk, and cashier. (AR 164-70.) Most recently, she worked as a personnel officer for the State of Mississippi, from February 2000 to June 2011. (AR 124, 164, 170). The plaintiff left that position on disability retirement. (AR 353, 369.)

The plaintiff filed the applications for SSI and DIB on June 17, 2011, alleging that she became unable to work on June 15, 2011. (AR 100-06). In her applications, the plaintiff listed mini strokes, kidney malfunction, anxiety and depression as the impairments limiting her ability to work. (AR 123.) In the Function Report, which the SSA requested for additional information, the plaintiff stated that she could dress, bathe, groom, and feed herself, but would take a long time doing so. (AR 144.)

On June 24, 2011, the plaintiff was examined by a nurse practitioner, Eurekia Samuel. (AR 252-54.) Ms. Samuel diagnosed the plaintiff with hypertension, malaise and fatigue, depression, and hypothyroidism. (AR 253.) On August 22, 2011, Ms. Samuel returned a Statement of Examining Physician form to the Public Employees' Retirement System of Mississippi (the

2

"PERS"), which was reviewing the plaintiff's application for disability retirement. (AR 353, 429.) In the form, Ms. Samuel listed TIA (transient ischemic attack, or "mini stroke"), depression and anxiety as the plaintiff's diagnoses. The severity of TIA was listed as "severe" and the severity of the depression and anxiety were listed as "severe - moderate." Ms. Samuel wrote that the plaintiff's impairments were "mental status – headaches, TIA." (AR 429.)

Dr. Charles Williams treated the plaintiff on April 20, April 28, and May 31, 2011, for high blood pressure and renal failure. (AR 257.) Dr. Williams stated that the plaintiff had blood pressure within normal limits, when he examined the plaintiff for the last time on May 31, 2011. (AR 257.) Dr. Williams also referred the plaintiff to Dr. Bishop who treated the plaintiff on several occasions in May and June 2011 for, among other things, anxiety and insomnia. (AR 208-14.)

On October 11, 2011, the plaintiff was examined by a consulting internist, Dr. William Lathan. (AR 300-02.) Upon examination, Dr. Lathan stated that the plaintiff had no restriction other than psychiatric problems. (AR 302.) Dr. Lathan noted that the plaintiff could perform all activities of personal care and daily living. (AR 300.)

On October 11, 2011, the plaintiff was examined by a consulting psychologist, Dr. Dmitri Bougakov. (AR 296-99.) Upon

3

examination, Dr. Bougakov noted that the plaintiff was somewhat limited in ability to learn new tasks and perform complex tasks. (AR 298.) Dr. Bougakov opined that the plaintiff's difficulties were related to psychiatric deficits and possibly to some cognitive deficits. (AR 298.) However, Dr. Bougakov stated that the plaintiff's difficulties did not appear to be significant enough to interfere with her ability to function on a daily basis. (AR 298.)

On October 25, 2011, a State Agency reviewing psychologist, T. Harding, concluded that the plaintiff did not have any severe mental impairment, based on the medical evidence. (AR 303-16.)

The plaintiff's claims were initially denied on October 25, 2011. (AR 58.) On November 30, 2011, the plaintiff filed a request for a hearing before an ALJ. (AR 69-70.)

On January 17, 2012, the plaintiff went to Essen Medical Associates for psychiatric care. (AR 514.) Dr. Leonardo Vando diagnosed the plaintiff with generalized anxiety disability and episodic mood disorder and prescribed medication. (AR 514.) The plaintiff followed up with Dr. Vando continuously on a monthly basis.[1] (AR 514-19.) In the initial examination of the plaintiff on January 17, 2012, Dr. Vando stated that the plaintiff was in an anxious mood. (AR 514.) However, in all subsequent follow up

---

[1]     The record includes Dr. Vando's medical notes only up to June 2012. A subpoena for the records was issued on June 20, 2012 (AR 512), and the notes were prepared for submission on June 27, 2012. (AR 514-19.)

examinations from February 2012, to June 2012, Dr. Vando indicated that the plaintiff was in good mood and did not suggest any mental impairments other than anxiety and mood-related disorders. (AR 515-19.). Cognition and memory were within normal limits throughout the visits. (AR 514-19.)

On March 1, 2012, the plaintiff complained of pain in her hands and fingers for the first time. (AR 524.) Dr. Hanna ordered a nerve test, which yielded findings suggestive of median nerve entrapment. (AR 523, 538.) On April 25, 2012, Dr. Hanna examined the plaintiff again. (AR 522.) In this examination, the plaintiff had no significant complaint, and Dr. Hanna did not find any problem in the plaintiff's joints. (AR 522.)

On April 18, 2012, Dr. Vando returned a Statement of Examining Physician form to the PERS, which was reviewing the plaintiff's application for disability retirement. (AR 332, 353). In the form, Dr. Vando stated that the plaintiff had "severe functional impairment due to depressive symptoms – i.e. mood lability, low energy and motivation, excess worrying and cognitive deficit." (AR 392.)

The hearing before the ALJ was held on June 14, 2012. (AR 25.) The plaintiff appeared without an attorney. (AR 27.) The ALJ explained to the plaintiff her right to representation and asked if she wanted to adjourn the hearing so that she could

obtain an attorney. (AR 27-29.) The plaintiff chose to proceed without representation. (AR 29.) At the hearing, the plaintiff stated that she had suffered from depression for a number of years and started getting sick in January 2011. (AR 43, 47.) She also testified that she could not work because getting to a job and working put anxiety and stress on her. (AR 47.) The plaintiff admitted that she could cook, clean, do the laundry, use a cellphone, take public transportation, manage her money, and socialize with other people. (AR 47.) The ALJ stated that he would send the plaintiff to a doctor for a psychiatric examination and would subpoena relevant records. (AR 52.) At the end of the hearing, the ALJ informed the plaintiff of subsequent steps that he would take if he could not write a fully favorable decision for her. (AR 53.)

On August 14, 2012, the plaintiff was examined by a consulting psychologist, Dr. Arlene Broska. (AR 562-68). In the examination, the plaintiff stated that she had never been hospitalized for a mental health condition but had been seeing a psychiatrist, Dr. Vando, for eight months. (AR 562.) The plaintiff complained of sleeping problems and difficulty in handling the grief arising from her son's death in a car accident in 2008. (AR 563.) The plaintiff stated that she could perform most of her daily activities. (AR 564.) Upon examination, Dr. Broska stated that the plaintiff's psychiatric

6

problems did not appear to be significant enough in themselves to interfere with the plaintiff's ability to function on a daily basis. (AR 565.) Dr. Broska also stated that the plaintiff did not have any vocational limitations other than that the plaintiff may not always appropriately deal with stress. (AR 565.) In the SSA's "Medical Source Statement of Ability to Do Work-Related Activities (Mental)" form, Dr. Broska indicated that the plaintiff had no restriction for work-related mental activities. (AR 567.)

On November 30, 2012, the ALJ sent a letter to the plaintiff's counsel[2] along with the subpoenaed exhibits, informing her about further actions that the plaintiff could take before the ALJ made a decision. (AR 185-87.) The plaintiff did not respond to this letter. See Tr. at 3.

On December 31, 2012, the ALJ issued his decision denying benefits. (AR 5-19.) The ALJ evaluated the plaintiff's claims for SSI and DIB pursuant to the five-step sequential evaluation process set forth in 20 C.F.R. §§ 404.1520 and 416.920. (AR 8-19.) First, the ALJ found that the plaintiff did not engage in substantial gainful activity after the date disability was alleged to have begun. (AR 8.) Second, the ALJ found that the plaintiff had severe impairments of mood and anxiety-related

---

[2]    The plaintiff retained her current counsel on July 16, 2012. (AR 96-97.)

7

disorders. (AR 9-17.) Noting that none of the examinations yielded remarkable results, the ALJ concluded that the alleged impairments other than mood and anxiety-related disorders were not supported by the objective clinical findings to constitute severe impairments. (AR 9-17.) Third, the ALJ found that the plaintiff's mood and anxiety-related disorders were not the same as or medically equivalent to any listed impairment entitling the plaintiff to benefits. (AR 17.) Fourth, the ALJ assessed the plaintiff's residual functional capacity and found that the plaintiff retained the capacity to engage in all exertional levels of unskilled work. (AR 17.) However, the ALJ found that the plaintiff could not perform her past relevant work. (AR 17.) Fifth, the ALJ considered the plaintiff's vocational factors and her residual functional capacity, and applied Rule 204.00 of the Commissioner's medical-vocational guidelines ("the grids"). (AR 17-18.) The ALJ ultimately concluded that the plaintiff was not disabled within the meaning of the Act and denied the claims for DIB and SSI benefits. (AR 19.)

The plaintiff appealed to the Appeals Council. (AR 24.) The Appeals Council declined review of the plaintiff's claims, finding no reason for review. (AR 1.) The ALJ's determination then became final, and the appeal to this Court ensued.

## II.

### A.

A court may set aside the Commissioner's decision only if it is based on legal error or not supported by substantial evidence in the record. See 42 U.S.C. § 405(g) (made applicable to SSI cases by 42 U.S.C. § 1383(c)(3)); Butts v. Barnhart, 388 F.3d 377, 384 (2d Cir. 2004) as amended on reh'g in part, 416 F.3d 101 (2d Cir. 2005). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Selian v. Astrue, 708 F.3d 409, 417 (2d Cir. 2013) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)) (internal quotation marks and alterations omitted).

### B.

The definition of "disabled" is the same for DIB and SSI. See Barnhart v. Walton, 535 U.S. 212, 214 (2002). A claimant seeking DIB or SSI is considered disabled if the claimant is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C § 423(d)(1)(A); accord 42 U.S.C. § 1382c(a)(3)(A).

The analytical framework for evaluating claims of
disability for DIB and SSI is set out in 20 C.F.R. §
404.1520(a). Accord id. § 416.920(a). In essence, "if the
Commissioner determines (1) that the claimant is not working,
(2) that [s]he has a 'severe impairment,' (3) that the
impairment is not one [listed in Appendix 1 of the regulations]
that conclusively requires a determination of disability, and
(4) that the claimant is not capable of continuing in [her]
prior type of work, the Commissioner must find [her] disabled if
(5) there is not another type of work the claimant can do."
Burgess v. Astrue, 537 F.3d 117, 120 (2d Cir. 2008) (citations
omitted); see also, e.g., Selian, 708 F.3d at 417–418.

The claimant must first establish a disability under the
Act (the framework's first four steps). See Burgess, 537 F.3d at
120. If satisfied, the Commissioner must establish that, given
the claimant's residual functional capacity, there is still work
the claimant could perform in the national economy (the
framework's fifth step). See id. In meeting her burden of proof
on the fifth step, the Commissioner, under appropriate
circumstances, may rely on the medical vocational guidelines
contained in 20 C.F.R. Part 404, Subpart P, Appendix 2, commonly
referred to as "the grids." The grids take into account the
claimant's residual functional capacity in conjunction with the
claimant's age, education, and work experience. Based on these

factors, the grids indicate whether the claimant can engage in any other substantial gainful work that exists in the national economy. Generally, the result listed in the grids is dispositive on the issue of disability. However, the grids are not dispositive where they do not accurately represent a claimant's limitations because the claimant suffers from non-exertional limitations that significantly limit her capacity to work. See Pratts v. Chater, 94 F.3d 34, 39 (2d Cir. 1996).

With respect to claims of disability due to mental impairments, Social Security Regulations require the ALJ to use a "special technique" to evaluate the claimed mental impairments. See 20 C.F.R. § 404.1520a(a); id. § 416.920a(a). The "special technique" requires the ALJ to rate the degree of functional limitation resulting from the plaintiff's mental impairment. See id. § 404.1520a(d); id. § 416.920a(d).

### III.

The Court reviews the ALJ's determination according to the same five-step process used by the ALJ. In this case, judgment on the pleadings should be granted in favor of the Commissioner. The ALJ carefully evaluated the plaintiff's claims of physical and mental impairments, and there is substantial evidence to support the ALJ's determination that the plaintiff was not disabled under the Act.

At step one, the ALJ correctly found that the plaintiff was not engaged in substantial gainful activity during the relevant time period. (AR 18.) At the hearing, the plaintiff testified that she stopped working in early June 2011. (AR 34.)

At step two, the ALJ correctly found that the plaintiff had impairments that qualified as "severe" based on the requirements in the regulations. (AR 18.) To be "severe," a claimant's impairment or combination of impairments must significantly limit her physical or mental ability to do basic work activities. 20 C.F.R. §§ 404.1520(c), 416.920(c). Here, the evidence establishes that the plaintiff had severe impairments due to mood and anxiety-related disorders. (AR 10.) The ALJ correctly followed the "special technique," as set forth in 20 C.F.R. § 404.1520a and § 416.920a, by specifying the degree of limitation in each of four functional areas.[3] (AR 17.) Then, the ALJ correctly concluded that the plaintiff's impairments were "severe." See 20 C.F.R. §§ 404.1520a(d)(1), 416.920a(d)(1).

The evidence does not establish severe physical impairments. In the applications for DIB and SSI, the plaintiff listed kidney malfunction and mini strokes. (AR 123.) However, the plaintiff did not claim a physical impairment except carpal

---

[3]     The relevant portion of the ALJ's decision provides that: "I find that the claimant has at most mild difficulties in activities of daily living, and social functioning and, at most, moderate problems in concentration, persistence and pace. The claimant does not have periods of de-compensation which accord with the requirements of the listing 12.04 and 12.06." (AR 17.)

tunnel syndrome at the hearing. (AR 35, 37.) The plaintiff initially complained of pain in her hands and fingers on March 1, 2012. (AR 524.) Electro-diagnostic testing of the plaintiff yielded evidence suggesting median nerve entrapment. (AR 536-38.) However, the record of a subsequent examination performed by Dr. Hanna on April 25, 2012, indicates that the plaintiff did not have any impairment in her hands and fingers. (AR 522.) The ALJ discussed all physical impairments that appeared in the record and provided his reasons for finding that those impairments were not severe. (AR 9-13.) The ALJ correctly concluded that the plaintiff did not have any severe physical impairment.[4] (AR 9.)

At step three, the ALJ correctly determined that the plaintiff's mental impairments did not meet or medically equal any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (AR 17-18.) The ALJ considered Listing 12.04 (Affective Disorders) and 12.06 (Anxiety Related Disorders) in the Appendix. (AR 17.)

To qualify as a listed impairment under Listing 12.04, the claimant's impairment must satisfy the criteria in both paragraphs A and B, or the criteria in paragraph C, of that listing. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04. Paragraph

---

[4]    The ALJ did not have to consider the plaintiff's physical impairments beyond step two because he correctly concluded that those impairments were not "severe." Burgess, 537 F.3d at 120.

13

A requires "[m]edically documented persistence, either continuous or intermittent," of one of the conditions specified in that paragraph. Id. at §12.04.A. The persistent condition from paragraph A must result in at least two of the paragraph B conditions: (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence or pace; or (4) repeated episodes of decompensation, each of extended duration. Id. at §12.04.B. Paragraph C requires "[m]edically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support," and accompanied by one of the additional conditions specified in that paragraph. Id. at § 12.04.C.  Those conditions are (1) repeated episodes of decompensation, each of extended duration, (2) a residual disease process such that certain changes would be predicted to cause decompensation, or (3) current history of one or more years inability to function outside a highly supportive living arrangement.

To qualify as a listed impairment under Listing 12.06, the claimant's impairment must satisfy the criteria in both paragraphs A and B, or the criteria in both paragraphs A and C,

14

of that listing. Id. § 12.06. Paragraph A requires "[m]edically documented findings" of one of the conditions specified in that paragraph. Id. at § 12.06.A. The condition from paragraph A must result in at least two of the paragraph B conditions, which are the same as the paragraph B conditions under § 12.04. Id. at § 12.06.B. Otherwise, the condition from paragraph A must result in the paragraph C condition: "complete inability to function independently outside the area of one's home." Id. at § 12.06.C.

Upon evaluating whether the plaintiff's impairments satisfied § 12.04, the ALJ properly considered the medical records as well as the plaintiff's own testimony. (AR 17.) Dr. Bougakov and Dr. Broska performed psychological examinations of the plaintiff on separate occasions. They agreed that the plaintiff's psychiatric impairments did not appear to be significant enough to interfere with the plaintiff's ability to function on daily basis. (AR 298, 565.) Neither of these examinations yielded any evidence of "marked" difficulties in the plaintiff's attention and concentration. (AR 298, 565.) In addition, the plaintiff stated in multiple occasions that she could perform most of daily activities and socialize with others. (AR 47, 143-50, 298, 564.) In light of these records, the ALJ correctly found that the paragraph B criteria were not satisfied because the plaintiff has "at most mild difficulties in activities of daily living, and social functioning and, at

most, moderate problems in concentration, persistence and pace."[5] (AR 17.)

At step four, the ALJ concluded that the plaintiff retained the functional capacity to engage in all exertional levels of unskilled work activity. (AR 18.) However, the ALJ found that the plaintiff was unable to perform her past relevant work as a personnel officer and as a chief cashier. (AR 9, 18.) The ALJ did not state the basis for this finding in his decision. However, whether this finding was erroneous or not does not matter in this case because the ALJ's finding was favorable to the plaintiff, and he proceeded to step five of the sequential analysis. Even if the ALJ's finding at this step was erroneous, the error was harmless because the ALJ went through the step five analysis.

At step five, the ALJ applied the grids as a framework for decisionmaking, and concluded that the plaintiff was not disabled under the Act. (AR 17-18.) The ALJ concluded that the plaintiff's non-exertional limitations did not significantly

---

[5]    The ALJ did not provide his rationale with respect to the § 12.04.C criteria. However, it is plain that they were not satisfied. The record reflects no indication that the plaintiff has ever experienced extended episodes of decompensation or needed a highly supportive living arrangement.

Because Paragraph B of § 12.06 is the same as Paragraph B of § 12.04, the plaintiff's mental impairments must satisfy Paragraph C criteria to qualify as a listed impairment under Listing 12.06. The ALJ did not provide his rationale with respect to § 12.06.C, as well. However, it is also plain that § 12.06.C was not satisfied. The record does not indicate that the plaintiff's mental impairments resulted in "complete inability" to function independently outside the area of her home.

compromise her ability to perform work at all exertional levels, and that, in accordance with 20 C.F.R. Part 404, Subpart P, Appendix 2, Rule 204.00, a finding of not disabled was indicated. (AR 17-18.) The ALJ correctly concluded: "Considering the range of work at all exertional levels, which the claimant is still functionally capable of performing, in combination with her age, education, and work experience, and using the above-cited Section 204.00 as a framework for decisionmaking, the claimant is not disabled." (AR 19.) The plaintiff contends that the ALJ erred at this step by using the grids rather than calling a vocational expert.

"[T]he mere existence of a nonexertional impairment does not automatically require the production of a vocational expert nor preclude reliance on the guidelines." Bapp v. Bowen, 802 F.2d 601, 603 (2d Cir. 1986). Instead, application of the grids is inappropriate "where the claimant's work capacity is significantly diminished beyond that caused by [her] exertional impairment." Id. at 605-06. In this context, "significantly diminish" means an additional loss of work capacity that "so narrows [the] claimant's possible range of work as to deprive [her] of a meaningful employment opportunity." Id. at 606.

The ALJ recognized the inappropriateness of using the grids where a claimant's non-exertional limitations significantly compromised the claimant's ability to perform work at all

17

exertional levels. (AR 18.) While the ALJ did not state the degree to which non-exertional limitations compromised the plaintiff's ability to work at all exertional levels, his decision to use the grids as a framework for decisionmaking necessarily reflects his conclusion that the plaintiff's non-exertional limitations did not significantly compromise the plaintiff's ability to perform such work. The record supports that conclusion. The record in this case does not establish any non-exertional limitations that significantly diminished the plaintiff's ability to work. The ALJ found that the plaintiff had at most mild difficulties in activities of daily living and social functioning, any, at most, moderate problems in concentration, persistence, and pace. (AR 17.) Both Dr. Bougakov and Dr. Broska, who conducted consultative examinations of the plaintiff, stated that the plaintiff's non-exertional impairments do "not appear to be significant enough to interfere with the claimant's ability to function on a daily basis." (AR 298, 565.) Dr. Bougakov did not mention any limitation other than difficulty in learning new tasks and performing complex tasks. (AR 298.) Dr. Broska did not mention any vocational limitation other than difficulty in dealing with stress. (AR 565.) Therefore, there was no legal error in applying the grids and not calling a vocational expert. See Woodmancy v. Colvin, 577 F. App'x 72, 76 (2d Cir. 2014) (per curiam) (unpublished)

18

(ALJ does not have to call a vocational expert even where claimant's non-exertional limitations are "severe," if substantial evidence shows limitations do not significantly limit range of work permitted such limitations).

## IV.

The plaintiff argues that the ALJ erred by (1) failing to develop the record properly, (2) misevaluating the plaintiff's credibility, and (3) failing to follow the "treating physician rule". These arguments are unpersuasive.

## A.

The plaintiff contends that the ALJ failed to develop the record properly, particularly in view of the fact that the plaintiff was not represented at the hearing. In particular, the plaintiff insists that the ALJ erred by not requesting medical source statements and additional information. The record does not support these contentions.

The record in this case includes extensive medical records. The ALJ subpoenaed relevant evidence and referred the plaintiff to a consultative examination after the hearing. (AR 52-54, 350-559, 562-68.) The record includes medical records from Dr. Bishop and Dr. Vando who treated the plaintiff's mental impairments. (AR 209-14, 332.) The record also includes Dr. Vando's medical notes, covering the period up to his examination of the plaintiff on June 12, 2012 – about a year past the

19

alleged disability onset date. (AR 334-41.) Moreover, the ALJ
ordered a psychiatric evaluation after the hearing. (AR 52, 562-
68.) Dr. Broska, who conducted that examination, provided his
opinion specifically on the restrictions for work-related mental
activities. (AR 567.) Although the record does not include a
statement provided by Dr. Hanna, who diagnosed the plaintiff
with carpal tunnel syndrome, the record includes Dr. Hanna's
medical notes. (AR 520-59). Moreover, the plaintiff testified
that she would be able to work but for her anxiety problems. (AR
39.) The ALJ had a complete medical history about the
plaintiff's alleged impairments and could make an informed
decision. In this case, the ALJ had no duty to request medical
source statements about the plaintiff's functional abilities
because he had a sufficient basis to make a disability
determination.

Therefore, the ALJ did not err by not requesting any
further medical records or a medical source statement of
residual functional capacity. See Tankisi v. Comm'r of Soc.
Sec., 521 F. App'x 29, 34 (2d Cir. 2013)(per curiam)
(unpublished)(remand inappropriate where ALJ failed to request
medical opinions of plaintiff's residual functional capacity
because record supported ALJ's informed finding); see also, 20
C.F.R. § 404.1513(b)(6) ("Although we will request a medical
source statement about what you can still do despite your

impairment(s), the lack of the medical source statement will not make the report incomplete."); 20 C.F.R. § 416.913(b)(6) (same).

The plaintiff also argues that the ALJ failed to inform the plaintiff of her right to representation. Contrary to the plaintiff's contention, at the beginning of the hearing the ALJ carefully explained the usefulness of counsel and further informed the plaintiff of options for obtaining free counsel. (AR 27-29.) The ALJ then offered to adjourn the hearing so that the plaintiff could obtain counsel if she wanted to do so. (AR 29.) Moreover, the Hearing Notice issued by the SSA about a month before the hearing enclosed a form explaining a claimant's right to representation. (AR 85-86.)

In support of her contention that the ALJ should have sought more information, the plaintiff included a Residual Functional Capacity Form dated February 12, 2015 and a Mental Residual Functional Capacity Form dated February 11, 2015 with her papers in connection with the current motions. The district court "may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." 42 U.S.C. § 405(g). Upon meeting certain conditions, medical evidence generated after an ALJ's decision may be considered. See Pollard v. Halter, 377

21

F.3d 183, 193 (2d Cir. 2004) (remanding case to ALJ to consider medical evidence generated after ALJ's decision, upon finding that the proffered evidence was material). To introduce new evidence, the plaintiff must show that the proffered evidence is (1) new and (2) material, and that she had (3) good cause for her failure to present the evidence earlier. Tirado v. Bowen, 842 F.2d 595, 597 (2d Cir. 1988). The proffered evidence is "material" only if it is "both relevant to the claimant's condition during the time period for which benefits were denied and probative." Id. The evidence cannot be material if it does not relate to the time of disability determination.

The period relevant to this case is from June 15, 2011, the alleged date of disability, to December 31, 2012, the date of the ALJ's decision. However, the forms included in the proffered evidence were prepared in February 2015 over two years after the period at issue.  The forms were prepared by new doctors with no explanation as to how, if at all, they relate to the plaintiff's mental status two years earlier. The proffered evidence has no indication of relevance to the period at issue, and thus is not material. Therefore, they do not support the contention that the ALJ should have sought more information, and they are not a basis to remand to the Commissioner for a further hearing.

In the meantime, the plaintiff is free to file a new application for DIB and SSI if her condition has worsened, and

22

she is now disabled. At oral argument, the Government informed
the Court that the plaintiff had filed another application,
which was denied, and she is awaiting a hearing before an ALJ.
Tr. at 23.

The plaintiff also insists that the ALJ failed to conduct a
fair and impartial hearing. Although due process demands
impartiality of the ALJ, the Court "must start, however, from
the presumption that the hearing officers . . . are unbiased.
This presumption can be rebutted by a showing of conflict of
interest or some other specific reason for disqualification. But
the burden of establishing a disqualifying interest rests on the
party making the assertion." Schweiker v. McClure, 456 U.S. 188,
195-96 (1982). The plaintiff did not specify any interest that
could potentially make the ALJ biased in this case.

While the plaintiff denigrates the ALJ's conduct at the
hearing, a fair reading of the transcript indicates that the ALJ
was attentive to the plaintiff's responses. The ALJ also
developed the record after the hearing and invited the
plaintiff's counsel to provide additional information or request
an additional hearing which, the ALJ explained, he would grant
unless he received records supporting a favorable determination
for the plaintiff. (AR 185.) The ALJ's ultimate determination
was a thorough and lengthy consideration of the record. While

the plaintiff disagrees with that determination, there is no indication of bias.

### B.

The plaintiff also contends that the ALJ misevaluated the plaintiff's credibility and did not accord sufficient weight to the plaintiff's subjective evaluations of her pain and symptoms.

An ALJ has discretion to evaluate the credibility of a claimant and to make an independent judgment regarding the true extent of a claimant's symptoms in light of medical findings and other evidence. McLaughlin v. Sec'y of Health, Educ. & Welfare of U.S., 612 F.2d 701, 705 (2d Cir. 1980). It is the "role of the Commissioner, not the reviewing court," to resolve evidentiary conflicts and to appraise the credibility of witnesses, including with respect to the severity of a claimant's symptoms. Cichocki v. Astrue, 534 F. App'x 71, 75 (2d Cir. 2013) (per curiam) (unpublished). "After considering plaintiff's subjective testimony, the objective medical evidence, and any other factors deemed relevant, the ALJ may accept or reject claimant's subjective testimony." Saxon v. Astrue, 781 F. Supp. 2d 92, 105 (N.D.N.Y. 2011). "Deference should be accorded the ALJ's determination" on credibility of the claimant's testimony because the ALJ heard the testimony and observed the claimant's demeanor. Gernavage v. Shalala, 882 F. Supp. 1413, 1419 n.6 (S.D.N.Y. 1995). Hence, an ALJ's decision

to discount a claimant's statements of symptoms "must be accepted by a reviewing court unless it is clearly erroneous." Centano v. Apfel, 73 F. Supp. 2d 333, 338 (S.D.N.Y. 1999).

The record is sufficient to show that the ALJ fairly assessed the plaintiff's credibility. The ALJ explicitly referred to 20 C.F.R. §§ 404.1529, 416.929 as the standards adopted for determining credibility.[6] (AR 17). The ALJ discounted the plaintiff's subjective complaints because they were "not adequately supported by objective findings in the record" and "inconsistent with her activities." (AR 17.) That determination was not clearly erroneous.

The plaintiff cites Horan v. Astrue and insists that she was entitled to greater credibility due to her unbroken record of 32 years of work. Horan v. Astrue, 350 F. App'x 483, 485 (2d Cir. 2009) (per curiam) (unpublished) ("[A] claimant with a good work record is entitled to substantial credibility when claiming an inability to work because of a disability."). This argument is misplaced.

A claimant's work history "is just one of many factors that the ALJ is instructed to consider in weighing the credibility of claimant testimony." Schaal v. Apfel, 134 F.3d 496, 502 (2d Cir.

---

[6]     See Dahl v. Comm'r of Soc. Sec., No. 12-cv-302 (GLS/ESH), 2013 WL 5493677, *9 (N.D.N.Y. Oct. 1, 2013)(adopting the Magistrate Judge's reasoning that the ALJ's citation of the governing Regulation and Ruling indicates the ALJ's awareness of and intent to follow proper legal principles).

1998). Therefore, the ALJ's skepticism of the claimant's testimony must be upheld "[i]f the [ALJ's] findings are supported by substantial evidence." Aponte v. Sec'y, Dep't of Health & Human Servs. of U.S., 728 F.2d 588, 591 (2d Cir. 1984). Indeed, Horan simply assumes that "the claimant is credible unless that assumption is rebutted by substantial evidence," and does not provide a categorical rule. Montaldo v. Astrue, No. 10-cv-6163 (SHS), 2012 WL 893186, at *18 (S.D.N.Y. Mar. 15, 2012). The plaintiff in this case has a long prior work history. However, the ALJ's determination with respect to the plaintiff's credibility is supported by substantial evidence. Therefore, the ALJ did not err by according less weight to the plaintiff's subjective complaints of pain and symptoms.

### C.

Finally, the plaintiff contends that the ALJ erred by failing to follow the treating physician rule.

"[T]he 'treating physician rule' directs the ALJ to give controlling weight to the opinion of the treating physician so long as it is consistent with the other substantial evidence." Morgan v. Colvin, 592 F. App'x 49, 50 (2d Cir. 2015) (per curiam) (unpublished) (quoting Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004) (per curiam)). "When other substantial evidence in the record conflicts with the treating physician's opinion, however, that opinion will not be deemed controlling.

And the less consistent that opinion is with the record as a whole, the less weight it will be given." Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999). Even if a treating physician's opinion is not afforded controlling weight, the Commissioner applies various factors in determining the weight to give the opinion. 20 C.F.R. §§ 404.1527(c), 416.927(c). Moreover, the Commissioner is required to explain the weight it gives to the opinion of a treating physician. See id. §§ 404.1527(c)(2), 416.927(c)(2). A district court may remand without hesitation "when the Commissioner has not provided good reasons for the weight given to a treating physician's opinion." Morgan, 592 F. App'x at 50.

The plaintiff insists that the ALJ should have found that the plaintiff's impairments qualified as a listed impairment based on Dr. Vando's statement that the plaintiff "has severe functional impairment due to depressive symptom." (AR 332). The ALJ provided several grounds for not affording controlling weight to Dr. Vando's statement. The ALJ noted that Dr. Vando's diagnosis was unsupported by objective clinical findings. Moreover, it was inconsistent with the mental status examinations conducted by Dr. Vando over a period of time, which did not yield any evidence of marked functional disorder. (AR 15, 334-41.) The ALJ also referred to Dr. Broska's report for the consultative examination in which the plaintiff stated that

27

she was able to perform most activities of daily living and to
socialize. (AR 15, 564-65.) The plaintiff's statement about her
daily activities in her applications for DIB/SSI, and the result
of a consultative examination by Dr. Bougakov, further support
the ALJ's position. (AR 143-48, 296-99.) In sum, there is
substantial evidence that is inconsistent with Dr. Vando's
singular statement, and the ALJ provided the reasons for not
giving controlling weight to that statement. Therefore, the ALJ
did not fail to follow the treating physician rule.

The plaintiff also points to the ALJ's reliance on Dr.
Bishop's statement that the plaintiff had a GAF (global
assessment of functioning) score of 60, indicative of moderate
symptoms or moderate difficulty in social or occupational
functioning. See Diagnostic and Statistical Manual of Mental
Disorders, DSM-IV-TR 34 (4th ed. 2000) (the "DSM"). The
plaintiff contends that the ALJ's reliance on the GAF score was
erroneous, and therefore warrants reversal or remand. The
argument is unpersuasive.

The plaintiff cites to a Social Security Administrative
Message AM-13066 REV, dated October 14, 2014. AM-13066 was
initially issued on July 22, 2013, in response to publication of
the Fifth edition of the DSM, which deleted the GAF rating for
assessment of mental disorders. Although AM-13066 REV expresses
several concerns about the use of a GAF rating, the Message

clearly provides that "[f]or purposes of the Social Security disability programs, when it comes from an acceptable medical source, a GAF rating is a medical opinion." Moreover, the ALJ issued his decision on December 13, 2012, before AM-13066 was initially issued. Accordingly, in deciding the plaintiff's case, the ALJ had no obligation to take into account the SSA's subsequent guidance referred to by the plaintiff.[7]

## CONCLUSION

The Court has considered all of the arguments of the parties. To the extent not specifically addressed above, the remaining arguments are either moot or without merit. For the foregoing reasons, the plaintiff's motion for judgment on the pleadings is **denied**. The defendant's motion for judgment on the pleadings is **granted**, and the Commissioner's decision is **affirmed**. The Clerk is directed to enter judgment and to close this case. The Clerk is also directed to close all pending motions.

**SO ORDERED.**

Dated:     New York, New York
           September 9, 2015           _____/s/_____
                                             **John G. Koeltl**
                                       **United States District Judge**

---

[7]     See Holloman v. Colvin, No. 13-cv-3804, 2014 WL 5090030, at *7 (E.D. Pa. Oct. 9, 2014)("To the extent that AM-13066 changed the weight an ALJ may accord to GAF evidence, [the plaintiff] has provided no evidence that the 2013 policy applies retroactively to the ALJ's 2012 decision in this case. On the contrary, changes in the SSA regulations and corresponding policies typically apply only in cases decided after the enactment of the changed regulation and/or policy.") (internal quotations omitted).